# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Erin Bove,                                  :
                              Petitioner    :
                                            :
              v.                            :    No. 350 C.D. 2019
                                            :    Argued: November 14, 2019
Workers' Compensation Appeal                :
Board (Stein d/b/a Provider of Co-op        :
Services),                                  :
                              Respondent    :


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
            HONORABLE MICHAEL H. WOJCIK, Judge
            HONORABLE CHRISTINE FIZZANO CANNON, Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**                 **FILED:  December 9, 2019**


Erin Bove (Claimant) petitions for review of a March 7, 2019 Order of the Workers' Compensation (WC) Appeal Board (Board), affirming a decision by a WC Judge (WCJ) that Claimant was an independent contractor, not an employee, and thus was ineligible for WC benefits.  After review, finding no error, we affirm.


## I.     BACKGROUND

In 2011, Claimant started working for Cathryn Stein d/b/a Provider of Co-op Services (Defendant), providing services to individuals with special needs and disabilities.  (WCJ Finding of Fact (FOF) ¶ 2a.)  On August 15, 2016, Claimant was

working primarily with one client who had a waiver[1] issued by the state, which dictated the types of services to be provided, goals, hours, and rates of pay. (*Id.* ¶ 2b.) On this date, Claimant was taking the client to speech therapy when Claimant's vehicle was struck by another vehicle that ran a stop sign. (*Id.* ¶ 2g.) As a result of the accident, Claimant suffered various injuries and was treated at a local emergency room. (*Id.* ¶ 2g-h.)

Following her injury, Claimant filed a claim petition alleging she suffered work-related injuries, namely "[r]ight ankle, back, neck and left trapezius injuries, headaches, concussion, chest wall contusion, [and] cervical herniation including radiculopathy into shoulder and arm," while in the course and scope of her employment with Defendant. (Reproduced Record (R.R.) at 4a.) Defendant filed an Answer, wherein it denied, among other things, that Claimant was an employee of Defendant. (Certified Record (C.R.) Item 4.) Multiple hearings were held before the WCJ, at which Claimant and Defendant presented evidence as to the employment relationship.[2]

---

[1] A waiver allows federal and state funds that have historically been designated for institutional care to be used towards care of an individual in the home and community instead. (FOF ¶ 3b.)

[2] The parties also presented evidence as to the nature and extent of Claimant's injuries. Although the WCJ summarized the medical testimony, because the WCJ found no employment relationship existed, the WCJ did not resolve any discrepancies between the medical witnesses' testimony and any legal issues related to the medical portion of the claim. Because the only issue before this Court is whether Claimant is an employee of Defendant, we do not discuss the medical evidence.

## A. Claimant's Evidence

Claimant testified on her own behalf and presented the testimony of the Intellectual Disability Deputy Administrator for Chester County's Department of Mental Health, Intellectual and Developmental Disabilities (Deputy Administrator).

Claimant testified in pertinent part as follows.[3] Claimant has worked for Defendant as support staff for individuals with special needs and disabilities since June 2011. (Jan. 11, 2017, Hr'g Tr. at 7.) She worked Mondays beginning at 9 a.m. through Tuesdays at 5 p.m. and again Wednesdays from 9 a.m. to Thursdays at 5 p.m. (*Id.* at 7-8.) The client with whom Claimant worked had a waiver and a government-issued individual support plan (ISP), which establishes the number of hours to be provided, the client's goals, what services to bill, rates for those services, and who is responsible for the services. (*Id.* at 8, 32.) The ISP is drafted by a county supports coordinator based on state requirements. (*Id.* at 32.) For this particular client, Claimant would: assist with morning hygiene and meals; take the client to and from appointments, shopping, or other excursions; assist with speech and physical therapy exercises; and monitor the client's oxygen overnight. (*Id.* at 8-9.) Claimant was paid based on the type of service provided, ranging from $5.79 every 15 minutes for companion services to $6.83 every 15 minutes for HAP or habilitation services. (*Id.* at 11.) Claimant was paid 75 percent of the above amounts, and Defendant retained 25 percent of the above amounts. (*Id.*) Rates of pay were established by the state. (*Id.* at 32-33.) Claimant would track her time and enter detailed notes of daily activities into Defendant's website. (*Id.* at 12.) Aside from training on how to navigate the website and enter billing and notes, Defendant did not provide Claimant with any training. (*Id.* at 15.) Claimant used her own cell

---

[3] Claimant's testimony is in the Reproduced Record at pages 26a-72a and 74a-95a.

phone, computer, and vehicle; was not reimbursed for mileage or gas or provided sick or vacation time; obtained her own training to better serve her clients' needs; and received no health or disability insurance benefits from Defendant. (*Id.* at 16, 27, 36-37.) She could be terminated at any time. (*Id.* at 15-16.) Claimant set her own schedule and arranged for coverage if needed. (*Id.* at 34.) If coverage could not be obtained, she notified Defendant, which would then seek coverage. (*Id.*) Additional work was available, of which Claimant would receive notice via email from Defendant. (*Id.* at 35.) She signed an independent contractor agreement that provided Defendant would not furnish WC insurance to Claimant. (*Id.* at 37; *see also* Independent Contractor Agreement, R.R. at 236a-38a (executed copy) and 239a-42a (unsigned copy).) At the time she originally started with Defendant, Defendant told Claimant she was covered by WC insurance and Claimant was never subsequently told she was no longer covered by such a policy. (Aug. 2, 2017, Hr'g Tr. at 9.) Claimant was told by Defendant that it carried liability insurance for staff. (*Id.* at 8.) Claimant received a 1099 form each year from Defendant and filed taxes as self-employed. (*Id.* at 12.)

Deputy Administrator testified via deposition as follows.[4] She oversees authorization of services for consumers, such as the client with whom Claimant worked, and monitors providers, such as Defendant. (Deputy Administrator Dep. Tr. at 6.) Every two years, Deputy Administrator ensures a provider's contract with the Commonwealth is current and that the provider discloses who is working with it, that those workers have appropriate clearances, and any required insurance is valid. (*Id.* at 7.) When asked what insurance is required, Deputy Administrator responded that "[i]t depends on the provider. So it's general liability insurance and

---

[4] Deputy Administrator's deposition testimony is in the Reproduced Record at pages 98a-120a.

4

Workers' Comp[.] as appropriate." (*Id.*) During the two-year check, the only thing documented is whether the provider is familiar with an individual's ISP. (*Id.* at 10.) An ISP includes "[e]verything from demographics to personal preferences to support needs" and is developed by a "team" comprised of the consumer, family, friends, and the provider. (*Id.* at 11-12.) An agency's responsibility for care varies from consumer to consumer, and Deputy Administrator did not know the specifics of Claimant's client here. (*Id.* at 9.) Agencies are monitored by a percentage sample, and monitoring includes reviewing progress notes, which are compiled by the provider, here Defendant, each month, and comparing them against service bills. (*Id.* at 12-13.) Defendant does not contract with the county but contracts with the Pennsylvania Office of Developmental Programs, which is a division of the Department of Human Services (DHS). (*Id.* at 13.) The Office of Developmental Programs is responsible for administering waiver programs across the Commonwealth, and the counties serve as agents of the Office of Developmental Programs. (*Id.* at 14.)

### B.    Defendant's Evidence

Cathryn Stein, owner of Provider of Co-Op Services (Owner), testified via deposition for Defendant as follows.[5] Owner started Defendant's business in 2008. (Stein Dep. Tr. at 5.) Claimant signed an independent contractor agreement in 2016, which is one of three agreements Claimant signed with Defendant. (*Id.* at 7-8.) Individuals new to Defendant receive 65 percent whereas Claimant received 75 percent of the billable rate because Claimant was "grandfathered" in since she started work for Defendant in 2011. (*Id.* at 9.) Defendant does not reimburse for expenses,

---

[5] Owner's deposition testimony is in the Reproduced Record at pages 128a-98a.

such as mileage, training, clearances, licenses, or supplies. (*Id.* at 9-10.) Nor did Defendant provide vacation, sick leave, retirement benefits, Social Security benefits, health or disability benefits, unemployment compensation or WC insurance per the independent contractor agreement. (*Id.* at 11.) Under the independent contractor agreement, Claimant was free to work for other agencies or other consumers or become a provider herself. (*Id.* at 10-11, 20.) The rate of pay is set by the Commonwealth or the Centers for Medicare & Medicaid Services (CMS). (*Id.* at 12.) Claimant set her own hours and would submit weekly timesheets with a description of services rendered through Defendant's internet portal and was sent a 1099 each year. (*Id.* at 13-14, 21.) Defendant did not withhold taxes for Claimant. (*Id.* at 52.) When Claimant started, Defendant did complete an I-9 verification. (*Id.* at 58.)

An ISP is implemented and approved by the county supports coordinator and approved through the DHS. (*Id.* at 14-15.) An ISP provides a detailed plan of what services an individual needs, frequency and duration of such services, and how those services are to be delivered. (*Id.* at 15.) Every contractor, such as Claimant, who works with a client must review the ISP, answer questions acknowledging the contractor understands it, and submit weekly timesheets. (*Id.* at 15-16.) When a consumer needs services, the position is posted on the Defendant's internet portal. (*Id.* at 17.) A meeting is arranged between the interested contractor and the consumer, where the consumer's family interviews the contractor. (*Id.*) If it is a "good fit," Defendant obtains authorization to begin service. (*Id.*) After the meet and greet, the contractor may decline to work with the consumer and vice versa. (*Id.* at 18.) Other contractors worked with the client with whom Claimant worked, including some from agencies other than Defendant. (*Id.*) The ISP dictates the

number of hours of services to be provided.  (*Id.* at 18-19.)  The client's family directed what appointments or activities were needed, and Claimant was not reimbursed for associated expenses.  (*Id.* at 19-20.)  At one point, Claimant developed a binder with instructions related to the client, which Claimant refused to provide to Owner when she requested a copy.  (*Id.* at 20.)  Claimant advised Owner it was Claimant's property, not Defendant's.  (*Id.*)

Defendant has 102 staff who receive 1099s.  (*Id.* at 28.)  Defendant does not have any employees who receive W-2s.  (*Id.*)  When asked about WC insurance, the following exchange occurred:

Q.   . . . Now did you purchase [WC] insurance for any of your independent contractors in August of 2016?

A.  I had a policy in effect from 7/1 to this year June 30, 2017.  Yes, I do have a policy.

Q.  And did that cover all 102 of your independent contractors?

A.  It is on a percentage basis under wages.  And yes, I paid for it.

Q.  And [Claimant] was covered under that policy?

A.  I would imagine if she was receiving wages.

. . .

Q.  Was it purchased for her?

A.  I am required by rules and regulations to have [WC insurance].

Q.  Is that a state requirement?

A.  Yes, it is.  And I think it's CMS at the moment.

(*Id.* at 38-39.)

7

Under a prior agreement from 2012, Defendant agreed to provide "commercial general liability insurance[,] professional liability insurance, errors and omission [insurance,] and" WC insurance to independent contractors. (*Id.* at 43; 2012 Independent Contractor Agreement ¶ 12, R.R. at 221a.) The provision was changed sometime before 2016. Defendant did not specifically notify Claimant the provision was removed, although Claimant received a copy of the new agreement without it. (Stein Dep. Tr. at 44.) When asked if Defendant continued to provide these insurances after they were removed from the contract, Owner responded "[i]t's a part of me being able to be an agency, so I had to provide it." (*Id.*) Besides the change in WC insurance, other changes to the independent contractor agreement included changes in the percentage of pay and billing timeframes. (*Id.* at 45.) In addition, a former copy of a Policy and Procedures manual provided that staff who suffer injury should make a claim to the State Workers' Insurance Fund and provided a policy number for same. (*Id.* at 48.)

## C. WCJ Decision

Based upon the above, the WCJ concluded Claimant was not an employee of Defendant. (FOF ¶ 10.) In reaching this conclusion, the WCJ found Deputy Administrator's testimony credible and accepted it as fact. (*Id.* ¶ 7.) The WCJ also found the testimony of Claimant and Owner to be in general agreement and therefore credible. (*Id.* ¶ 8.) However, where Claimant's and Owner's testimony differed, the WCJ credited Owner over Claimant based upon her experience as owner and the documentary evidence that supported her testimony. (*Id.*) Based upon the evidence, the WCJ specifically found:

8

a. Claimant signed an independent contractor agreement, received a 1099 form for her payments and filed a tax return indicating she was self-employed.

b. Claimant's job duties were controlled by a government-issued ISP which detailed the services to be performed, the number of hours, the goals to be achieved, and the rates of pay. Defendant posted the ISP online and arranged for an initial meeting between Claimant and the client.

c. Claimant worked full-time in one client's home, but was free to take assignments with other agencies. Claimant set her hours according to the client's needs.

d. Claimant was required to wear a badge which identified her as staff of Defendant's company.

e. Defendant billed the client and paid Claimant according to her reported hours and the establish[ed] rate schedule.

f. In accordance with the Independent Contractor Agreement, Defendant did not reimburse Claimant for out-of-pocket expenses, travel, training, licenses, clearances or supplies. Defendant did not provide any vacation, sickness, Social Security, unemployment, or [WC] benefits.

(*Id.* ¶ 9.)

The WCJ considered various factors that the Court has set forth to evaluate whether an employer-employee relationship exists and found this case was "factually similar to *Edwards v. W[orkers' Compensation Appeal Board] (Epicure Home Care, Inc.)*, 134 A.3d 1156 (Pa. Cmwlth. 2016)." (WCJ Decision at 11.) The WCJ explained that the defendant in *Edwards* exercised the same or greater control over the claimant there than Defendant did over Claimant here, and, yet, the Court determined the claimant in *Edwards* was an independent contractor. (*Id.*) Thus, the

WCJ concluded Claimant was an independent contractor, not an employee of Defendant. (*Id.* at 12.)

### D.    Board Opinion and Order

Claimant appealed to the Board, which affirmed in a 4-3 decision. The majority found, based upon the WCJ's findings, that Claimant did not meet her burden of establishing an employment relationship. (Board Opinion (Op.) at 8.) The Board applied the common law factors to determine the employment relationship, noting that "[t]he primary factor in determining whether an individual is an employee or an independent contractor is the right to control either the work to be done or the manner in which the work is to be performed, irrespective of whether that control is actually exercised." (*Id.* at 8, 11.) It agreed with the WCJ that Defendant exercised less control over Claimant here than the defendant did over the claimant in *Edwards*. (*Id.* at 10.) The Board rejected Claimant's argument that because Defendant was required to carry WC insurance, Defendant's denial of an employment relationship violated public policy, noting that the Pennsylvania "Supreme Court in *Universal Am-Can[, Ltd. v. Workers' Compensation Appeal Board (Minteer)*, 762 A.2d 328 (Pa. 2000),]* expressly rejected the proposition that compliance with federal and state regulations mandate a finding of employee status." (Board Op. at 11.) To the extent Claimant was arguing that if coverage was not extended in situations such as this that claimants would begin pursuing claims against the Commonwealth, which is funding the services provided, the Board stated that issue was not before it. (*Id.* at 9.) Finally, the Board found that the WCJ's findings were supported by substantial evidence and no errors of law were committed. (*Id.* at 11.) The Board stated it was "not issu[ing] rulings on whether or not the circumstances of the next care giver would yield a contrary result . . . but, . .

10

. **the facts in this case** support the findings that Claimant was an independent contractor." (*Id.* at 12 (emphasis added).) Accordingly, the Board affirmed the WCJ's Decision.

The dissent took issue with the majority "acknowledg[ing] that Claimant was covered by a [WC] policy, yet walk[ing] past that fact and simply apply[ing] a traditional employer-employee analysis." (Board Dissenting Op. at 1.) The dissent stated this was "a clear case of estoppel" because Defendant provided WC insurance as required by law and cannot now deny coverage. (*Id.*) The dissent stated that "[t]here clearly is a developed line of case law that supports the concept of workers' [compensation] insurance by estoppel, [which] prevents employers from both covering their employees with a valid [WC] insurance policy, and then subsequently denying that they are employees." (*Id.*) The dissent pointed to Owner's testimony that insurance was provided to Claimant. (*Id.* at 2 (citing Stein Dep. Tr. at 38-39).) The dissent further stated that, under the law, Defendant was required to provide it. "Consequently, because Defendant was obligated through [f]ederal and [s]tate laws and regulations to supply [WC] insurance to its workers, and in fact, did supply [WC] insurance to its workers, including Claimant, it is estopped from denying that an employer-employee relationship exists." (*Id.* at 3.) As for the majority's reliance on *Edwards*, the dissent found *Edwards* distinguishable because, there, the clients paid the aides directly and the defendant merely acted to match aides with clients and there was no government regulation requiring coverage, whereas here, Defendant pays the aides and Defendant is "wholly funded by federal and state Medicaid dollars, which are completely contingent on the agency complying with all applicable regulations, most importantly, that [it] provide[s] [WC] coverage for [its] home health workers." (*Id.* at 3 n.1.)

11

Claimant now seeks review of the Board's Order.

## II. PARTIES' ARGUMENTS[6]

On appeal,[7] Claimant argues the WCJ erred in dismissing the Claim Petition. Claimant argues that the WCJ did not render a reasoned decision based on substantial evidence. This argument appears to challenge the WCJ's reliance on *Edwards*, to find Claimant was not an employee, which Claimant continues to assert is misplaced because the case is distinguishable as follows. First, she was not paid by the client, as was the claimant in *Edwards*. Second, the client in *Edwards* was to provide WC insurance, whereas here, Claimant argues, Defendant did because the law required it to do so. Third, the client in *Edwards* directed services to be provided, and here, the Commonwealth does. In addition, Claimant contends she is not a home health aide, as was the claimant in *Edwards*. Instead, Claimant provided other services, including habilitation services, to a client with special needs, all of which is controlled through the state program and the client's ISP.

Claimant also argues that the Court must find in Claimant's favor because federal and state law and regulations require agencies, such as Defendant, to provide WC insurance for staff. Claimant further argues Defendant is estopped from denying coverage since it is required to provide WC insurance and did, in fact, provide such coverage. Claimant further argues that public policy requires coverage under these circumstances, and the independent contractor agreement is void as it violates public policy since Defendant is required to provide WC insurance. In

---

[6] The parties' arguments have been reordered for ease of discussion.

[7] Our review is limited to determining whether constitutional rights were violated, errors of law were committed, or necessary findings of fact are supported by substantial evidence. *Universal Am-Can*, 762 A.2d at 331 n.2.

12

addition, Claimant argues she must be considered an employee of Defendant because she was providing care to a Medicaid recipient at the direction of the Commonwealth. Because of the Commonwealth's direction and control, Claimant argues agencies, such as Defendant, must provide WC insurance; otherwise, workers who are injured will seek to hold the Commonwealth liable as the employer in the future. According to Claimant, "[a]t the very least, Defendant was a co-employer with the Commonwealth or the client/Medicaid recipient and [] Defendant was the primary employer responsible to maintain [WC] insurance." (Claimant's Brief (Br.) at 22.)

Defendant responds that the WCJ Decision was well-reasoned and supported by substantial evidence. Defendant argues the WCJ properly relied upon *Edwards* and found the amount of control Defendant exercised over Claimant here was less than the defendant exercised over the claimant in *Edwards*, and no employment relationship was found in *Edwards*. Specifically, Defendant asserts here: (a) the client controlled Claimant's job; (b) the ISP was not drafted by Defendant; (c) Claimant chose her own hours; (d) the rate of pay was established by the Commonwealth; (e) Claimant could work elsewhere if she chose; (f) the client's family picked the caregiver and either could reject the other; and (g) Defendant provided no tools, training, or reimbursement for expenses.

Defendant also contends that existence of a WC insurance policy does not prove an employment relationship existed with a specific individual. The requirement that an agency have such insurance does not mean every person providing services for it is covered, Defendant argues. It claims that under Supreme Court precedent, Defendant's compliance with government regulations that are not negotiable cannot be considered in evaluating whether Defendant is an employer

13

under the WC Act.[8]  The key factor, according to Defendant, is the control Defendant exerts over Claimant, but if work is controlled by the government, that fact cannot be considered in determining that a private defendant is an employer.  Moreover, Defendant argues the WCJ's Decision does not violate public policy because the existence of the independent contractor agreement, which Claimant argues is void for violating public policy, played little to no role in the WCJ's decision.  In addition, Defendant argues Claimant failed to present any evidence to establish an agency relationship between it and the Commonwealth.  Nor did Claimant raise the agency issue on appeal to the Board.  Defendant also asserts Claimant did not preserve her estoppel argument before the WCJ or Board.  Even if the Court was to consider the estoppel argument, Defendant contends there was no representation by Defendant and reliance by Claimant here.

## III.  DISCUSSION

### A.  Employment Relationship

We begin with Claimant's argument that the WCJ did not issue a reasoned decision based upon substantial evidence.  Section 422(a) of the WC Act provides:

> All parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached.  The workers' compensation judge shall specify the evidence upon which the workers' compensation judge relies and state the reasons for accepting it in conformity with this section.  When faced with conflicting evidence, the workers' compensation judge must adequately explain the reasons for rejecting or discrediting competent evidence.  Uncontroverted evidence may not be rejected for no reason or for an irrational reason; the workers'

---

[8] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

14

compensation judge must identify that evidence and explain adequately the reasons for its rejection. The adjudication shall provide the basis for meaningful appellate review.

77 P.S. § 834.

The reasoned decision requirement does not allow a party to challenge or second-guess a WCJ's credibility determinations, as "determining the credibility of witnesses remains the quintessential function of the WCJ as the finder of fact." *Reed v. Workers' Comp. Appeal Bd. (Allied Signal, Inc.)*, 114 A.3d 464, 470 (Pa. Cmwlth. 2015). As we explained in *Green v. Workers' Compensation Appeal Board (U.S. Airways)* (*Green I*), "there is no requirement in the law that the WCJ's decision be 'well-reasoned' in the sense that a reviewing court agrees with the reasoning offered; the requirement is that the decision be 'reasoned' within the meaning of Section 422(a) of the Act." 28 A.3d 936, 940 (Pa. Cmwlth. 2011). Furthermore, a WCJ is not required to address all evidence presented. *Green v. Workers' Comp. Appeal Bd. (U.S. Airways)*, 155 A.3d 140, 147-48 (Pa. Cmwlth. 2017) (*Green II*). Rather, to meet the reasoned decision requirement, "a WCJ must only make findings necessary to resolve the issues raised by the evidence and relevant to the decision." *Id.* at 148.

Furthermore, the WCJ's findings must be supported by substantial evidence, which is defined as "relevant evidence that a 'reasonable person might accept as adequate to support a conclusion.'" *Pocono Mountain Sch. Dist. v. Workers' Comp. Appeal Bd. (Easterling)*, 113 A.3d 909, 918 (Pa. Cmwlth. 2015) (quoting *Wieczorkowski v. Workers' Comp. Appeal Bd. (LTV Steel)*, 871 A.2d 884, 890 (Pa. Cmwlth. 2005)). When reviewing a WCJ decision for substantial evidence, we must view the evidence in the light most favorable to the prevailing party and draw all reasonable inferences in the prevailing party's favor. *Id.* It is important to note that

15

"it is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made." *Lahr Mech. v. Workers' Comp. Appeal Bd. (Floyd),* 933 A.2d 1095, 1101 (Pa. Cmwlth. 2007).

With these general principles in mind, we turn to Claimant's argument. While Claimant labels this issue as one challenging the WCJ Decision as not being well-reasoned or supported by substantial evidence, Claimant does not appear to challenge any of the WCJ's findings of fact but instead appears to be arguing the WCJ misapplied the law to those facts. The crux of Claimant's argument is that the WCJ erred in relying on *Edwards* in concluding Claimant was an independent contractor instead of an employee of Defendant. More specifically, Claimant argues that the WCJ erred by relying on *Edwards* because the claimant in *Edwards* was a home health aide, whereas Claimant is not.[9] A review of the WCJ Decision, however, shows the WCJ did not rely on *Edwards* for the proposition that, as a matter of law, Claimant must be an independent contractor based simply on her job title or job duties. Rather, the WCJ cited *Edwards* to demonstrate that the level of control exercised by the putative employer over the claimant in that case was greater than the level of control Defendant exercised in this case over Claimant. The WCJ simply used *Edwards* to demonstrate that the common law factors for determining whether a claimant is an employee were not met under the specific facts of this case.

Preliminarily, in order to prevail on a claim petition, a claimant must establish all of the necessary elements, including the existence of an employment relationship. *Edwards*, 134 A.3d at 1162. Because independent contractors cannot recover benefits under the WC Act, the existence of an employment relationship is a

---

[9] Notably, on her Claim Petition, Claimant identified her job title as "Home Health Aide." (R.R. at 5a.)

16

threshold matter. *Am. Road Lines v. Workers' Comp. Appeal Bd. (Royal)*, 39 A.3d 603, 610 (Pa. Cmwlth. 2012). The existence of an employment relationship is a question of law to be determined based upon the **unique facts** presented in each case. *Id.*

The Pennsylvania Supreme Court has recognized that there is "no hard and fast rule" as to when an employment relationship exists, but has set forth a number of factors to be considered. *Hammermill Paper Co. v. Rust Eng'g Co.*, 243 A.2d 389, 392 (Pa. 1968). These factors include: (1) "control of [the] manner in which work is to be done"; (2) "responsibility for result only"; (3) "terms of agreement between the parties"; (4) "the nature of the work or occupation"; (5) "skill required for performance"; (6) "whether one employed is engaged in a distinct occupation or business"; (7) "which party supplies the tools"; (8) "whether payment is by the time or by the job"; (9) "whether work is part of the regular business of the [alleged] employer"; and (10) whether the alleged employer "has the right to terminate the employment at any time." *Id.* "[N]o one factor is dispositive." *Edwards*, 134 A.3d at 1162. However, "there are certain guidelines that have been elevated to be dominant considerations." *Universal Am-Can,* 762 A.2d at 333. A key factor is the right to control the work to be done and the manner in which it is performed. *Id.* Furthermore, "payment of wages and payroll deductions are significant factors, as is provision of workers' compensation coverage." *Edwards*, 134 A.3d at 1163.

With these factors in mind, the WCJ examined the evidence presented and concluded Claimant was not an employee of Defendant. The WCJ found "Claimant's job duties were controlled by a government-issued ISP, which detailed the services to be performed, the number of hours, the goals to be achieved, and the rates of pay." (FOF ¶ 9b.) Importantly, Claimant, even now, does not contest that

the Commonwealth controlled her work, not Defendant. In addition, the WCJ found Claimant could work for other agencies and was free to set her own hours. (*Id.* ¶ 9c.) The WCJ further found Defendant did not reimburse Claimant for any out-of-pocket expenses associated with her position, such as travel, training, licenses, clearances, or supplies. (*Id.* ¶ 9f.) In other words, Defendant did not supply Claimant with any "tools" to perform services on the client's behalf, *Hammermill*, 243 A.2d at 392, other than a website to input her time and notes. Nor did Defendant provide Claimant with vacation or sick leave, or any other benefits. (FOF ¶ 9f.) Claimant also received a 1099 and filed her taxes as self-employed. (*Id.* ¶ 9a.) She also signed an independent contractor agreement. (*Id.*) While Defendant arranged the initial meeting between Claimant and the client, provided an online portal through which Claimant tracked her time, and paid Claimant albeit at a rate set by the government, when these factors are weighed, we cannot conclude the WCJ erred in concluding Claimant did not satisfy her burden of proving she was an employee of Defendant. The WCJ did not view any one factor as dispositive. Rather, the WCJ weighed all of the *Hammermill* factors.

The WCJ then compared the facts of this case to *Edwards*. There, the claimant suffered an injury while working as a caretaker of a client to whom the putative employer matched her. The putative employer controlled assignments, set hourly wages, dictated use of a uniform, set hours, and provided training and guidelines for provision of services. *Edwards*, 134 A.3d at 1159. While the putative employer billed the clients, the clients paid the claimant directly, and the claimant deducted her own taxes and filed her returns as self-employed. *Id.* No benefits such as sick, vacation, or holiday time were provided. *Id.* at 1160. The WCJ found the claimant was an employee, but the Board reversed. On appeal, this Court affirmed. In doing

18

so, we concluded the Board did not reweigh the evidence but instead applied the *Hammermill* factors to the facts as found by the WCJ and properly concluded the claimant was an independent contractor. *Id.* at 1164.

The WCJ looked at the facts of *Edwards* and compared them to the facts of this case and concluded Claimant was an independent contractor. The WCJ made specific findings of fact, which are supported by the testimony and evidence presented, and applied the law to the facts as found. Further, the WCJ made credibility determinations, in which he credited Owner's testimony over Claimant's to the extent the testimony differed. The WCJ also thoroughly explained the reasoning behind the conclusion that Claimant was not an employee of Defendant. Based upon the findings of the WCJ, we cannot find the WCJ or Board erred in concluding that the factors weigh in favor of finding that Claimant was an independent contractor, not an employee of Defendant.

### B. Statutory and Regulatory Requirements

Having concluded the WCJ did not err in determining Claimant was not an employee of Defendant, we must determine whether WC coverage is required by federal and state law and regulations in this case, such that Defendant cannot deny this Claimant coverage, as Claimant asserts. While it appears undisputed that Defendant was required to have WC insurance, whether Defendant was required to cover all individuals providing any type of services on Defendant's behalf, including independent contractors, like Claimant, is unclear. Waiver services, such as those Claimant provided to the client here, are founded in federal law but administered at the state level. Under Section 1915(k)(4) of the Social Security Act, which is cited by Claimant:

19

[a] State shall ensure that, regardless of whether the State uses an agency-provider[10] model or other models to provide home and community-based attendant services and supports . . . , such **services and supports are provided in accordance with** the requirements of the Fair Labor Standards Act of 1938[11] and **applicable Federal and State laws regarding--**

(A) withholding and payment of Federal and State income and payroll taxes;

(B) **the provision of** unemployment and **workers[']** compensation insurance**;

(C) maintenance of general liability insurance; and

(D) occupational health and safety.

42 U.S.C. § 1396n(k)(4) (emphasis added).[12]

The plain language of Section 1915(k)(4) requires compliance with the WC Act; it does not by its terms expand the scope of the WC Act by mandating that every individual who performs services must be covered by WC insurance. It simply requires that, to the extent the WC Act applies, providers must comply. Under precedent, the WC Act is applicable to an employee of Defendant. *Universal Am-Can*, 762 A.2d at 330 ("An independent contractor is not entitled to benefits because of the absence of a master/servant relationship."). Had the government intended for every individual performing home and community-based attendant services under

---

[10] Owner acknowledges Defendant is an agency-provider model. (Stein Dep. Tr. at 51.) In contrast, participant models, according to Owner, are provided W-2 forms and fall under Department of Labor and Industry standards, such as limiting the number of hours worked. (*Id.* at 53.)

[11] 29 U.S.C. §§ 201-219.

[12] Claimant broadly asserts other federal and state laws and regulations also require provision of WC insurance but provides no specific citations. The Board dissent also broadly cites to the DHS regulations in Chapter 51 of the Pennsylvania Code for this requirement, but a review of that chapter does not reveal such a requirement.

the Social Security Act[13] to be covered by WC, it could have plainly stated so. The plain language of the Social Security Act does not require the provision of WC insurance in all situations, only when "**applicable** Federal and State laws" require it. 42 U.S.C. § 1396n(k)(4) (emphasis added). Absent more clear evidence of legislative intent to require coverage for all individuals providing such services, we decline to read such a requirement into the law. Interestingly, Claimant's own witness, Deputy Administrator, does not understand the requirement as Claimant does. When asked to identify the required insurances, Deputy Administrator responded, "**It depends on the provider.** So it's general liability insurance and Workers' Comp[.] **as appropriate**." (Deputy Administrator Dep. Tr. at 7 (emphasis added).) Furthermore, Claimant's proffered interpretation would be inconsistent with legal precedent. Our Supreme Court in *Universal Am-Can* held that compliance with federal and state regulations does not mandate a finding of employee status. 762 A.2d at 332. "Rather, compliance with these regulations is merely a factor that may be considered in a common law analysis of employee status." *Id.* In short, the fact that Defendant was required to comply with the WC Act does not mandate a conclusion that Claimant was an employee of Defendant or otherwise entitled to WC coverage.

### C. Defendant's Representations/Estoppel

The more compelling argument made by Claimant is whether Defendant is estopped from denying an employer-employee relationship when Defendant did, in fact, obtain a WC insurance policy and the independent contractor agreement from 2012 states that Defendant would provide WC insurance to Claimant. Similar to the

---

[13] 42 U.S.C. §§ 301-1397mm.

case law that compliance with government regulations does not mandate a finding of an employment relationship, case law estopping businesses from denying an employer-employee relationship is equally well-settled. In *American Insurance Company v. Workmen's Compensation Appeal Board (Barnhart)*, 606 A.2d 655 (Pa. Cmwlth. 1992), this Court held that because of the putative employer's actions, it was estopped from denying the claimant was its employee. In *Barnhart*, the claimant worked as a truck driver. One of the companies for which he worked was formed specifically for the purpose of obtaining WC insurance for independent drivers. Upon obtaining the insurance, the putative employer informed its drivers that coverage was now available and would be paid by the putative employer. The claimant was subsequently injured in an accident and sought coverage under the policy. The claim was denied on the basis that the claimant was not an employee but was an independent contractor. The referee[14] found the claimant was an employee, and the Board affirmed. On appeal, this Court did not reach the issue of what degree of control the putative employer exercised over the claimant, instead finding the putative employer was estopped from denying an employment relationship based on its actions. *Id.* at 658. "Because [the putative employer] obtained and paid for a [WC] policy and led the [c]laimant to believe that the policy covered him, [the putative employer] cannot now contend that an employer-employee relationship does not exist between it and the [c]laimant." *Id.* at 659.

We reached a similar result in *Tri-Union Express v. Workers' Compensation Appeal Board (Hickle)*, 703 A.2d 558 (Pa. Cmwlth. 1997). There, instead of the putative employer itself making representations to the claimant about coverage, third-party agents of the putative employer advised the claimant that coverage would

---

[14] WCJs were formerly known as referees.

be provided. Citing *Barnhart*, we found that based on the credited testimony that the third-party agents told the claimant he would be covered by WC insurance "and that this representation was a big factor in [the] claimant's decision to drive for [the putative] employer," the putative employer could not now deny the claimant was its employee. *Id.* at 563.

*Barnhart* and *Tri-Union Express* demonstrate that a putative employer may be estopped from denying the existence of an employer-employee relationship if a representation was made to the claimant that coverage would be provided and the claimant reasonably relied upon that representation. However, before we can address whether those elements are satisfied here, we must first address Defendant's argument that Claimant waived her estoppel claim by not raising it before the WCJ or the Board. "The doctrine of waiver is applicable in [WC] proceedings." *Riley v. Workers' Comp. Appeal Bd. (DPW/Norristown State Hosp.)*, 997 A.2d 382, 387 (Pa. Cmwlth. 2010). A review of the record shows it is arguable Claimant raised this issue in her appeal to the Board. In Paragraph 7 of her appeal to the Board, Claimant asserted, "[t]he [WCJ] disregarded evidence that the written agreement between the parties, when the Claimant was hired, required [] Defendant to have [WC] insurance and despite no change in the working relationship or additional consideration, a subsequent agreement required [] Claimant to provide her own [WC] coverage." (Appeal to Board ¶ 7, R.R. at 23a.)

In order to preserve an issue for appeal, a claimant must properly preserve it before **both** the Board **and** the WCJ. *Dobransky v. Workers' Comp. Appeal Bd. (Continental Baking Co.)*, 701 A.2d 597, 600 (Pa. Cmwlth. 1997) (an issue raised for the first time before the Board but not raised before the WCJ is considered waived). A review of the record does not show any evidence that Claimant raised

23

this estoppel argument before the WCJ. The transcripts from the hearings contain no such argument. Further, the WCJ Decision is devoid of any mention of such an argument being made in an otherwise thorough Decision. Thus, this issue is waived.

### D. Public Policy/Agency

Claimant's last argument is based on Defendant's relationship with the Commonwealth, as a provider of waiver services. Essentially, Claimant argues that public policy dictates that she be considered an employee because Defendant was required to provide WC insurance. She also claims that Defendant was acting as an agent of the Commonwealth and was required to provide such coverage. Because she was providing care to a Medicaid recipient at the direction of the Commonwealth, Claimant argues she should be entitled to WC benefits.

To the extent Claimant argues public policy mandates that we find she is an employee because Defendant was required to provide WC insurance, we disagree for the same reasons previously stated. As for Claimant's agency argument, we need not reach that issue because it does not appear as though Claimant raised this argument before the WCJ or the Board. Therefore, it is waived. *Dobransky*, 701 A.2d at 600.

## IV. Conclusion

Based upon the WCJ's findings of fact, which are supported by substantial evidence, we discern no error in the WCJ's or Board's determination that Claimant was not an employee of Defendant.

Accordingly, we affirm the Board's Order.

_____
**RENÉE COHN JUBELIRER,** Judge

24

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Erin Bove,                                            :
                           Petitioner                :
                                                     :
               v.                                    :     No. 350 C.D. 2019
                                                     :
Workers' Compensation Appeal                         :
Board (Stein d/b/a Provider of Co-op                 :
Services),                                           :
                           Respondent                :

# **O R D E R**

**NOW**, December 9, 2019, the Order of the Workers' Compensation Appeal

Board, in the above-captioned matter, is **AFFIRMED.**

_____

**RENÉE COHN JUBELIRER,** Judge